1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
9                              AT SEATTLE
10
11   LYNN NUNNALLY,

12                        Plaintiff,                    CASE NO. C07-1323JLR

13          v.                                          ORDER

14   XO COMMUNICATIONS, et al.,

15                        Defendants.

16

17          This matter comes before the court on Defendant XO Communication's ("XO")

18   motion for summary judgment on Plaintiff Lynn Nunnally's claim of constructive

19   discharge in violation of public policy (Dkt. # 29) and XO's motion for sanctions (Dkt. #

20   35). Having reviewed all the papers and heard the argument of counsel on the motion for

21   summary judgment, for the following reasons, the court GRANTS the motion for

22   summary judgment and DENIES the motion for sanctions.

23

24

25

26

27

28

     ORDER – 1

# I. BACKGROUND

Ms. Nunnally sues her former employer XO claiming constructive discharge in violation of public policy and wage and hour violations.[1]  Ms. Nunnally resigned from XO approximately 11 months after calling XO's ethics hotline to complain about an alleged local sales management practice of counting orders as complete before meeting all requirements for booking them.  Ms. Nunnally believes that, as a result of her complaint, her co-workers changed their attitudes toward her, isolated her and harassed her.  As a result, she was forced to resign.

Ms. Nunnally started working for XO in May 2000 as a voice sales engineer.  It appears that in 2004 Ms. Nunnally was promoted to senior sales engineer, the position that she held when she resigned.  (Declaration of Kelly Benton ("Benton Decl.") (Dkt. # 22) ¶ 2.)  Even though Ms. Nunnally's job title changed "often" her job duties were essentially the same.  (*See* Deposition of Lynn Nunnally ("Nunnally Dep.") (Dkt. # 20-2) 75:4-16.)  XO describes Ms. Nunnally's job duties as "assisting the sales representatives in making sales, reviewing orders to be sure they were technically feasible to install for the customer, and making sure contracts and other documents were signed before 'approving' the orders so it could be 'booked' at the local level."  (Benton Decl. ¶ 2.)  Ms. Nunnally's description is similar:  "I was brought into potential and pending sales to determine feasibility for the customer.  I also had to ensure that all technical requirements and some regulatory requirements are met and properly documented in order to consummate a successful sale."  (Declaration of Lynn Nunnally ("Nunnally Decl.") (Dkt. # 29) ¶ 3.)

---

[1]On December 9, 2008, this court entered a stipulation and order dismissing the claim for wage and hour violations.  (*See* Dkt. # 31.)

ORDER – 2

In 2004, XO acquired another telecommunications company, Allegiance. (Nunnally Decl. ¶ 5.) Ms. Nunnally claims that after the Allegiance acquisition she "started to see more and more transactions that ignored or skirted the standards of business that had been guiding our work at XO throughout my employment. A common theme of irregularity of these transactions was that sales representatives submitted sales paperwork lacking necessary signatures or other information. The significance of this paperwork varied among transactions, including an absence of anything showing actual customer agreement to the terms of the sale, information being obtained from telephone carriers without proper written authority from customers, submission of sales known to be previously cancel[l]ed and transactions where customers were seeking toll avoidance, with the help of XO sales representatives." (Nunnally Decl. ¶ 6.)

On February 16, 2005, Ms. Nunnally called the XO ethics hotline to complain about certain sales that she believed were "unethical" or "violat[ed] some regulations." (Nunnally Decl. ¶ 11; *see* Declaration of Charles Wilcox ("Wilcox Decl.") (Dkt. # 21) ¶ 3.) In response to her complaint, XO, through outside counsel, hired a third party, Protiviti, to investigate Ms. Nunnally's allegations. (Wilcox Decl. ¶ 4.) XO claims that the resulting report by Protiviti is protected under the work product doctrine. (*Id.*) Ms. Nunnally was not provided access to the completed report but contends that Charles Wilcox, Chief Ethics Counsel and Assistant General Counsel, told her "that the outcome of the investigation was that the Seattle office of XO (and Atlanta, which I didn't know anything about) would be 'better off' because of my report. He thanked me, and I understood that the irregularities I reported were confirmed and that the company would correct these issues. HR representative Susan Knorr also told me that Protiviti found my concerns to be valid, although they found no evidence of fraud." (Nunnally Decl. ¶ 13.) Mr. Wilcox said that after reviewing the report he advised Ms. Nunnally that the

investigation had been completed and thanked her for bringing the issue forward. (Wilcox Decl. ¶ 5.) The investigation did not result (1) "in any discipline for salespeople based on the orders that Ms. Nunnally had identified"; (2) "in the need to change any sales report or report to the shareholders or the public"; and (3) "in any changes to accounting statements." (Wilcox Decl. ¶ 6.)

On March 28, 2005, Ms. Nunnally sent an email to Mr. Wilcox complaining that since making the ethics hotline complaint she felt as if she was being "harassed to the extent I feel like I work in [] a hostile environment." (Benton Decl., Ex. 1.) XO initiated an investigation of Ms. Nunnally's complaint. In an April 25, 2005 report, it was noted that Ms. Nunnally felt as if certain "Reps. and Managers" were being "snippy" to her; a file was removed from Ms. Nunnally's desk and she received a "curt" response; she felt "shunned" as "Reps." were not coming to her for assistance; and she had not been asked to go on customer visits by members of a certain team. (Benton Decl., Ex. 2.) Ms. Nunnally also was not offered a bagel by a fellow co-worker. (Nunnally Dep. 154:1-15.) It was concluded that "managers did not identify [Ms. Nunnally] as the individual raising the [ethics] complaint(s) which Protiviti investigated. Therefore, I do not know how they can be accu[]sed of retaliating against her" and "[h]er performance review is being written by Miina Siekkinen and; therefore should not be impacted by anyone [Ms. Nunnally] believes is retaliating against her." (Benton Decl., Ex. 2.) Around the date of the report, April 25, 2005, Ms. Nunnally complained that another co-worker failed to acknowledge her presence and did not offer her a muffin. (Nunnally Dep. 151:24-152:25.)

Ms. Nunnally continued to work for XO and, in a review dated April 25, 2005, received a positive performance evaluation. (*See* Benton Decl, Ex. 3.)

ORDER – 4

On May 31, 2005, Ms. Nunnally sent an email to Carl Grivner, who was then the CEO of XO, discussing the Protiviti investigation and the issues she had raised.  (*See* Nunnally Decl., Ex. 1.)  She also stated that she was not being allowed to work certain orders and that she felt as if she was being "forced out."  (*Id.*)  She asked Mr. Grivner to keep the information confidential as she did "not need anymore retaliation."  (*Id.*)  It is not clear what action, if any, XO took in response to this email.

On July 22, 2005, Ms. Nunnally received a verbal warning from her supervisor for missing meetings without giving prior notice.  (Benton Decl., Ex. 5; Nunnally Decl. ¶ 15.)  This verbal warning was not made a part of Ms. Nunnally's personnel file.  (Benton Decl. ¶ 9.)  At some point in July 2005 around the time of the verbal warning Ms. Nunnally was told to move from the cubicle she occupied near a number of the sales representatives that she supported to a location closer to her supervisor, Ms. Siekkinen, and the General Manager, Paul Merritt.  (Nunnally Decl. ¶ 15.)  The change was unwelcome for Ms. Nunnally because "at that time few of my peers were supportive or even courteous to me, and I was moved away from the ones that were . . . I now felt even more isolated."  (*Id.*)  Ms. Nunnally eventually moved back to her initial cubicle location. (Benton Decl. ¶ 7.)

In the summer of 2005, Ms. Siekkinen sent an email to sales representatives that any appointments they wanted to make with Ms. Nunnally needed to be scheduled with Ms. Siekkinen's involvement.  (Nunnally Decl. ¶ 16.)  The email only applied to Ms. Nunnally and not any other sales engineers.  (*Id.*)  Ms. Nunnally believed that the new rule was intended to allow Ms. Siekkinen to identify any problematic transactions and assign them to another sales engineer.  (*Id.*)  She also believed that it showed other employees that it was acceptable to treat her differently.  (*Id.*)  At this point, Ms. Nunnally had hired a lawyer and, once the lawyer mentioned the issue to XO, an email

was sent to all sales representatives requiring that all sales engineer appointments be routed through Ms. Siekkinen.  (*Id.*)

A fellow sales engineer, Andrene Murchison, who had previously worked with Ms. Nunnally at XO, returned to XO in August 2005.  (Declaration of Andrene Murchison ("Murchison Decl.") (Dkt. # 30) ¶¶ 2-4.)  Ms. Murchison filed a declaration stating that when she returned Ms. Nunnally was treated very differently than before.  (Murchison Decl. ¶¶ 4-5.)  Whereas before Ms. Nunnally had been regarded as a "go to" person she was now "isolated" and "clearly held in disfavor."  (Murchison Decl. ¶¶ 4-5.)  Ms. Murchison states that she was instructed by her and Ms. Nunnally's supervisor, Ms. Siekkinen, to "keep an eye" on Ms. Nunnally and to send Ms. Siekkinen an instant message telling her the precise time when Ms. Nunnally arrived at work.  (Murchison Decl. ¶ 7.)  Ms. Siekkinen told Ms. Murchison that "XO was trying to get rid of [Ms. Nunnally] (which I took to mean terminate her employment) . . . [by] any way possible. [Ms. Siekkinen] further said she had several conversations with Human Resources employees, asking for authority to have [Ms. Nunnally] 'written up.'"  (Murchison Decl. ¶ 8.)  Ms. Murchison "came to understand because of some document [Ms. Nunnally] had filed, HR did not think that XO Communications should write [Ms. Nunnally] up or fire her, that they 'couldn't touch her.'"  (Murchison Decl. ¶ 9.)  Ms. Siekkinen also told Ms. Murchison that "they wanted to be rid" of Ms. Nunnally because Ms. Nunnally "had lied about them, had said bad things that were not true in an effort to get them into trouble."  (Murchison Decl. ¶ 12.)  Ms. Siekkinen also showed Ms. Murchison papers which were described to Ms. Murchison as Ms. Siekkinen's efforts to "document" Ms. Nunnally and get rid of her.  (Murchison Decl. ¶ 10.)  Ms. Siekkinen cautioned Ms. Murchison to be careful on orders that she worked because Ms. Nunnally was calling the ethics hotline on "every little thing."  (Murchison Decl. ¶ 13.)  Ms. Murchison was also cautioned in a

ORDER – 6

welcome conversation with Matt Fassnacht, a more senior level regional manager that Ms. Nunnally was "trouble" and that Ms. Murchison should "stay away" from Ms. Nunnally. (Murchison Decl. ¶ 14.)

On September 16, 2005, Ms. Nunnally filed a claim with the Occupational Safety and Health Administration ("OSHA") for retaliation based on her complaint to the ethics hotline. (*See* Nunnally Decl. ¶ 20 , Ex. 2.) Ms. Nunnally's complaint was filed under the employee protection provisions of Title VII of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"). In a letter dated April 6, 2006, Ms. Nunnally was informed that OSHA had completed its investigation of her complaint and that "[a] preponderance of the evidence supports the respondent's position that no protected activity on the part of the complainant contributed to any of the adverse actions she alleges." (Benton Decl., Ex. 7.) The complaint was dismissed. (*Id.*) Ms. Nunnally was given 30 days to file an appeal. (*Id.*) No appeal was filed.

Ms. Nunnally asserts that by December 2005, "[m]anagers and co-workers were more hostile than ever now that they were aware I had taken further action against XO. It was clear that I was being scrutinized more than ever (and more than anyone else), so it was only a matter of time before the company found an excuse to fire me . . . I also had been sick to my stomach at work and on my commute for no reason other than stress. I had many numerous tearful episodes at work. But most important, I feared that I would be fired any day, and if I had not secured replacement employment, I could not support my family." (Nunnally Decl. ¶ 21.) Ms. Nunnally gave notice that she would resign her position with XO effective in January 2006 to take a position with another company. (Nunnally Dep. 26:2-9; Nunnally Decl. ¶ 22; Benton Decl. ¶ 14.)

Ms. Nunnally subsequently filed this action alleging that she was constructively discharged in violation of public policy. XO has moved for summary judgment.

ORDER – 7

## II. ANALYSIS

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no material factual dispute and he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets its burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000).

### A.    Constructive Discharge

XO first argues that summary judgment is warranted because Ms. Nunnally cannot establish that the "workplace slights" she alleges created a working environment where conditions were so intolerable that she was forced to quit. In response, Ms. Nunnally contends that she has submitted sufficient evidence to survive summary judgment. After a thorough review of the record before it, the court determines that Ms. Nunnally has demonstrated that there is a genuine issue of material fact regarding whether she was constructively discharged.

Washington law applies to Ms. Nunnally's constructive discharge claim because her claim is not based on a federal antidiscrimination statute. *See Wallace v. City of San Diego*, 479 F.3d 616, 626 n.3 (9th Cir. 2007). "A constructive discharge occurs where an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 700 P.2d 338, 339 (Wash. Ct. App. 1985). The word deliberately "requires a deliberate act of the employer creating the intolerable condition, without regard to the employer's mental state

ORDER – 8

as to the resulting consequence." *Sneed v. Barna*, 912 P.2d 1035, 1039 (Wash. Ct. App. 1996). "The inquiry is whether working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* Courts generally look "for evidence of either 'aggravating circumstances' or a 'continuous pattern of discriminatory treatment' to support a constructive discharge claim. *Id.* "The question of whether the working conditions were intolerable is one for the trier of fact, unless there is no competent evidence to establish a claim of constructive discharge." *Haubry v. Snow*, 31 P.3d 1186, 1192 (Wash. Ct. App. 2001). In contrast, "[a] voluntary resignation occurs when an employee abandons the employment because of a desire to leave, including such a desire motivated by a dissatisfaction with working conditions. Even when circumstances exist that would justify a finding of discharge, an employee's resignation may be voluntary if it was not prompted by the employer's oppressive actions." *Barrett*, 700 P.2d at 343.

XO first argues that Ms. Nunnally cannot identify any extreme or aggravated circumstances related to her employment or any pattern of discrimination. Ms. Nunnally identifies the following as evidence of aggravating circumstances:

> She was issued unprecedented discipline regarding conduct previously never the subject of criticism and which was not criticized or disciplined in her peers;

> She was moved to a seat immediately outside her supervisor's office and adjacent to the newly hired employee brought in to replace her;

> She, alone, was subject to surveillance and monitoring;

> She learned that another employee to whom she had complained and on whom she relied for direction was prohibited from meeting with her (and her alone) privately;

> Her immediate supervisor abruptly ended the relationship of trust with Nunnally and began subjecting her to open hostility, mistrust and unprecedented criticism – immediately after the investigation of Nunnally's protected complaint;

ORDER – 9

Employees refused to work with Nunnally, and that fact was now tolerated by management where it had previously been criticized;

Nunnally was isolated from the only employees who showed her respect;

Nunnally was denied a promotion (transfer) to a position for which she was qualified and which would have alleviated the daily retaliatory treatment;

Nunnally's complaints of retaliation were neither investigated or acknowledged;

Nunnally was denied the treatment promised in the company's policy regarding retaliation and investigation of employee complaints;

Nunnally alone was the subject of required pre-approval for work assignments;

Seattle management discussed with Nunnally's peers their specific intention to make Nunnally quit by reason of her having made ethics hotline complaints.

(Resp. (Dkt. # 27) at 20-21.) Although each claim has some grounding in the record, some allegations are not completely supported by the record before the court.

Ms. Nunnally's first contention is that she was "disciplined" for failing to notify her supervisor that she would miss three pre-scheduled meetings. There is evidence in the record that Ms. Nunnally received a verbal warning for missing three meetings. (*See* Benton Decl., Ex. 5.) This warning however was not placed in Ms. Nunnally's personnel file. (Benton Decl. ¶ 9.) It also does not appear that Ms. Nunnally was subject to any other discipline related to these June and July 2005 incidents. In the background section of her brief, Ms. Nunnally cites to page 94 of Ms. Siekkinen's deposition as supporting her assertion that this behavior was not "criticized or disciplined" in Ms. Nunnally's peers. The cited page does not include support for this statement. It looks as if the previous page may have discussed discipline but that page was not provided to the court. The incident, by itself, is insufficient as a matter of law to support a claim for constructive discharge.

ORDER – 10

Ms. Nunnally next asserts that she was moved to a new cubicle which was closer to her manager and adjacent to a newly hired employee brought in to replace Ms. Nunnally. The record supports Ms. Nunnally's assertion that she, along with other employees, were asked to move to new cubicles. (*See* Benton Decl., Ex. 4; Nunnally Dep. 158:5-160:7; Nunnally Decl. ¶ 15.) Ms. Nunnally, however, after talking to Ms. Benton in Human Resources, moved back to her original cubicle location. Ms. Nunnally does not contend that she suffered any adverse consequences as a result of her decision, without consulting her manager, to move back to her original cubicle. This, alone, is insufficient as a matter of law to support a claim for constructive discharge.

Ms. Nunnally contends that she alone was subject to "surveillance and monitoring." Ms. Murchison provided a declaration stating that she was told by Ms. Siekkinen to "keep an eye on" Ms. Nunnally and to send Ms. Siekkinen an instant message each day telling her the precise time when Ms. Nunnally arrived at work. (Murchison Decl. ¶ 7.) Ms. Murchison also states that the reason for the increased scrutiny was because "XO was trying to get rid of [Ms. Nunnally]" and that the "reason they wanted to be rid of [Ms. Nunnally] was that [Ms. Nunnally] had lied about them, had said bad things that were not true in an effort to get them into trouble." (Murchison Decl. ¶¶ 8, 12.) It appears that Ms. Murchison and Ms. Nunnally were only seated next to each other for a brief period of time before Ms. Nunnally moved back to her original cubicle location. Of all the allegations, this is the most concerning. In its reply brief, XO includes a motion to strike the declaration of Ms. Murchison as irrelevant on the grounds that Ms. Nunnally was not aware of what Ms. Murchison had allegedly been told to do until after she left her employment. It contends that Ms. Nunnally's decision to resign could not have been triggered by information that she learned after she was terminated. The court agrees with the general statement that Ms. Nunnally's decision to leave could

not have been precipitated by information that she did not know at the time that she resigned. However, Ms. Murchison's declaration does not provide new information that was unsuspected by Ms. Nunnally at the time she left her employment; rather, it merely corroborates what Ms. Nunnally believed she was experiencing at the time that she made her decision to leave.[2] The court denies the motion to strike and determines that there is a genuine issue of material fact regarding whether Ms. Nunnally was constructively discharged.

In support of her claim for constructive discharge Ms. Nunnally also claims that an employee with whom she had complained and on whom she relied for direction was prohibited from meeting with her. The individual to which Ms. Nunnally refers, Murray McLeod, was, at the time, an in-house counsel for XO. Mr. McLeod stated in his deposition that he was told by XO's General Counsel, Simone Wu, sometime between February and May 2005 that he was not allowed to meet alone with Ms. Nunnally. (*See* Deposition of Murray McLeod ("McLeod Dep.") (Dkt. # 28) 63:10-21.) Given Mr. McLeod's position as an attorney for the company and the fact that at this time Ms. Nunnally had made an ethics complaint and subsequently complained of retaliation, it does not seem unusual that the company asked Mr. McLeod not to meet alone with Ms.

---

[2]There is an exchange during Ms. Nunnally's deposition that could be construed as an admission that the reason that she thought that she was being watched was because of something that Ms. Murchison told her after her employment ended. (*See* Nunnally Dep. 227:7-228:5.) Because it is unclear and the issue is presented on summary judgment, the court, viewing the evidence in the light most favorable to Ms. Nunnally, concludes that the exchange does not conclusively demonstrate that Ms. Nunnally only came to believe that she was being watched after her employment ended.

ORDER – 12

Nunnally.[3]  In and of itself, this is not sufficient as a matter of law to support a claim for constructive discharge.

Ms. Nunnally also claims that her immediate supervisor, Ms. Siekkinen, abruptly ended their relationship of trust, subjected her to open hostility, mistrust and unprecedented criticism.  In the background section of her brief, Ms. Nunnally points to several pages of the deposition transcript of Ms. Siekkinen that were not provided to the court, including pages 53-56 and 85.  Ms. Nunnally also points to a portion of Ms. Siekkinen's deposition where she stated that she was frustrated with Ms. Nunnally because she had "a negative attitude and a lot of reps didn't want to ask her for help because they didn't want to approach her."  (Siekkinen Dep. 102:6-12.)  Ms. Siekkinen also testified that she did not counsel Ms. Nunnally about her "negative attitude."  (Siekkinen Dep. 103:4-11.)  The record does not support Ms. Nunnally's assertion that she was subjected to "open hostility," "mistrust" or "unprecedented criticism."  This allegation is therefore insufficient as a matter of law to support a claim for constructive discharge.

Ms. Nunnally next asserts that she was constructively discharged because employees refused to work with her and that this behavior was tolerated by management. Ms. Nunnally does not point to any evidence in the record about the refusal of certain employees to work with her and management's tolerance of these actions.  It does appear that there were some instances where employees complained that Ms. Nunnally was not sufficiently responsive or was unavailable.  (Declaration of Jean E. Huffington

_____

[3]It appears that subsequent to the time that Mr. McLeod was directed not to meet alone with Ms. Nunnally he told her, in what he characterized as his personal capacity, that she should keep accurate records of what was happening to her and hire an attorney.  (McLeod Dep. 59:15-63:9.)

ORDER – 13

("Huffington Decl.") (Dkt. # 28), Ex. B.)  This is not sufficient as a matter of law to support a claim for constructive discharge.

Ms. Nunnally also contends that she was isolated from employees who showed her respect.  There are no citations to the record in this section of Ms. Nunnally's brief.  As a result, the court is forced to guess as to what conduct this allegation relates.  The allegation appears to relate to the cubicle move, which has been previously discussed.  This alone is not sufficient as a matter of law to support a claim for constructive discharge.

Ms. Nunnally claims that she was denied a promotion (or transfer) to a position for which she was qualified and would have alleviated some of her concerns about retaliation.  XO points out that Ms. Nunnally conceded that this would not have been a promotion but a change to a different position that involved working from home rather than in the office.  (Nunnally Dep. 206:16-208:10.)  Ms. Nunnally was interviewed for the position and was not hired.  The court determines that under these circumstances the fact that Ms. Nunnally was not selected for one alternate position does not constitute constructive discharge.

Ms. Nunnally next argues that her complaints of retaliation were neither investigated or acknowledged.  This is simply not correct.  Ms. Nunnally sent an email to Mr. Wilcox on March 28, 2005, complaining of retaliation.  (*See* Benton Decl., Ex. 1.)  An internal investigation was conducted and Ms. Nunnally was interviewed on April 14, 2005.  (*See* Benton Decl., Ex. 2.)  In an April 25, 2005 investigation report, Susan Knorr concluded that there was no basis to Ms. Nunnally's complaints.  (*See id.*)  On June 1, 2005, Ms. Nunnally sent an email to Mr. Grivner, then the XO CEO, which alluded to retaliation.  (*See* Nunnally Decl., Ex. 1.)  She asked him to keep her concerns confidential because she did "not need anymore retaliation."  (*Id.*)  The email does not appear to raise

ORDER – 14

issues that were different than those investigated by Protiviti and XO Human Resources. It is not clear what XO did, if anything, in response to this email. This by itself is not sufficient as a matter of law to support a claim for constructive discharge.

Relatedly, Ms. Nunnally states that she was denied the treatment promised in the company's policy regarding retaliation and investigation of employee complaints. Again, because Ms. Nunnally did not provide record citations in this section it is impossible to determine what evidence in the record she claims supports this statement. This, without more, is insufficient as a matter of law to support a claim for constructive discharge.

Ms. Nunnally next contends that her supervisor, Ms. Siekkinen, sent an email to sales representatives that any appointments they wanted to make with Ms. Nunnally needed to go through Ms. Siekkinen. (Nunnally Decl. ¶ 16.) Ms. Nunnally does admit that after she pointed out that she alone had been singled out, a new email went out stating that all appointments with any sales engineer needed to go through Ms. Siekkinen. (*See id.*) Although this appears suspicious, it does not rise to the level of a constructive discharge.

Lastly, Ms. Nunnally states that XO management discussed with Ms. Nunnally's peers their specific intention to make Ms. Nunnally leave XO because of her ethics hotline complaints. This appears to relate to Ms. Murchison's declaration where she states that "[Ms. Siekkinen] told me the reason they wanted to be rid of [Ms. Nunnally] was that [Ms. Nunnally] had lied about them, had said bad things that were not true in an effort to get them into trouble"; "I was cautioned during a 'welcome' conversation with Matt Fassnacht, a more senior level regional manager of XO Communications, that [Ms. Nunnally] was 'trouble,' and that I should stay away from her"; and "[m]ore than one of the conversations with [Ms. Siekkinen] about [Ms. Nunnally] occurred in the presence of Paul Merritt, the General Manager of XO Communications' Seattle Office." (Murchison

Decl. ¶¶ 11-12, 14.)  As discussed earlier, these allegations are troubling and seem to confirm at least some of what Ms. Nunnally believed was happening.

The complaints articulated by Ms. Nunnally in isolation seem innocuous and even when considered as a group do not raise a genuine issue of material fact regarding whether Ms. Nunnally was constructively discharged.  However, when Ms. Nunnally's declaration is considered along with Ms. Murchison's declaration, a genuine issue of material fact is raised.  Particularly concerning is Ms. Murchison's statement that Ms. Nunnally's supervisor asked Ms. Murchison to monitor Ms. Nunnally's behavior and that XO was looking for any way to terminate Ms. Nunnally.  The court determines that there is a genuine issue of material fact regarding whether Ms. Nunnally was constructively discharged.  Because a genuine issue of material fact exists, the court declines to grant summary judgment with respect to the constructive discharge element of the public policy claim.

XO also argues that Ms. Nunnally fails to show any connection between the alleged hostile conduct and her resignation in January 2006.  It contends that the identified incidents occurred in the Spring and Summer of 2005 and are not close enough in time to her resignation to be connected.  In her deposition Ms. Nunnally stated that the incidents of which she complained continued to the time that she departed XO. (Nunnally Dep. 220:8-221:3.)  Based on Ms. Nunnally's testimony, the court rejects XO's argument.

**B.      Violation of Public Policy**

XO contends that even if Ms. Nunnally can establish constructive discharge, her public policy claim still fails because Ms. Nunnally cannot satisfy the jeopardy element of the claim.  Ms. Nunnally asserts that she has provided evidence demonstrating each of the elements of a constructive discharge in violation of public policy claim.  XO is

correct, Ms. Nunnally cannot establish the jeopardy element because, as a matter of law, the other means for promoting the public policy at issue are adequate.

An "at will" employment contract may generally be terminated by either the employer or employee at will. There is no dispute here that Ms. Nunnally was an "at will" employee. Washington courts have recognized an exception to this general rule when an employee is discharged in violation of public policy. *Hubbard v. Spokane County*, 50 P.3d 602, 606 (Wash. 2002). Public policy tort actions have been allowed in four different situations: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, *i.e.,* whistleblowing." *Gardner v. Loomis Armored Inc.*, 913 P.2d 377, 379 (Wash. 1996). "To establish liability for the tort, a plaintiff must prove (1) the existence of a clear public policy (the clarity element); (2) that discouraging the conduct would jeopardize the public policy (the jeopardy element); (3) that this conduct caused the discharge (the causation element); and (4) (if the employer presents evidence its conduct was justified) that the justification was invalid or pretextual (absence of justification element). *Korslund v. Dyncorp Tri-Cities Servs., Inc.*, 88 P.3d 966, 977 (Wash. Ct. App. 2004).

Because it is dispositive in this case, the court will first analyze the jeopardy element. "To establish the jeopardy element, a plaintiff must show that he or she engaged in particular conduct, and the conduct directly relates to the public policy, or was necessary for the effective enforcement of the public policy. This requires the plaintiff to argue that other means for promoting the policy are inadequate." *Hubbard*, 50 P.3d at 609 (internal citations and quotation marks omitted). A plaintiff must also show how the

ORDER – 17

threat of dismissal will discourage others from engaging in the protected conduct. *Id.*
"While the question whether the jeopardy element is satisfied generally involves a
question of fact, the question whether adequate alternative means for promoting the
public policy exist may present a question of law, i.e., where the inquiry is limited to
examining existing laws to determine whether they provide adequate alternative means of
promoting the public policy." *Korslund v. Dyncorp Tri-Cities Servs., Inc.*, 125 P.3d 119,
126 (Wash. 2005) ("*Korslund II*").

XO argues that because Ms. Nunnally could have pursued her claim using the
framework provided under Sarbanes-Oxley she cannot establish the jeopardy element. 18
U.S.C. § 1514A(a) provides in relevant part:

> No company . . . or any officer, employee, contractor, subcontractor, or
> agent of such company, may discharge, demote, suspend, threaten, harass
> or in any other manner discriminate against an employee in the terms and
> conditions of employment because of any lawful act done by the
> employee--(1) to provide information, cause information to be provided,
> or otherwise assist in an investigation regarding any conduct which the
> employee reasonably believes constitutes a violation of section 1341,
> 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange
> Commission, or any provision of Federal law relating to fraud against
> shareholders, when the information or assistance is provided to or the
> investigation is conducted by--(C) a person with supervisory authority
> over the employee (or such other person working for the employer who
> has the authority to investigate, discover, or terminate misconduct) . . . .

The act further provides that a person who alleges discharge or discrimination by any
person in violation of subsection (a) may seek relief by filing a complaint with the
Secretary of Labor or, if the Secretary fails to issue a decision within 180 days of the
filing of the complaint and the complainant has not caused the delay, the person may file
an action in the appropriate United States District Court. *See* 18 U.S.C. § 1514A(b)(1).
Remedies include "all relief necessary to make the employee whole." 18 U.S.C.
1514A(c)(1). This relief may take the form of reinstatement at the same level of
seniority, back pay with interest, and compensation for any special damages sustained

ORDER – 18

including litigation costs, expert witness fees and reasonable attorney fees.  18 U.S.C. §

1514A(c)(2).

On September 16, 2005, Ms. Nunnally filed a "Complaint for Retaliation Against

Whistleblower" pursuant to 18 U.S.C. §1514A and 29 C.F.R. § 1980.103.  (*See* Nunnally

Decl. ¶ 20, Ex. 2.)  In that action Ms. Nunnally alleged many of the same acts that form

the basis of this complaint including:

> a.  Nunnally experienced a hostile work environment involving, among other things, hostility and accusations about contacts to the ethics officer, accusations of insubordination, interference with Nunnally's proper discharge of work duties, and isolation of Nunnally from account executives.

> b.  Commencing in March 2005 and continuing unabated to the date of this Complaint, Nunnally was subjected to new and overt hostile treatment by Angela Thomas and subtle hostility from Albena Inglesbe and Dylan Fraser.  Nunnally's complaints about this treatment were not taken seriously and the treatment continued.

> c.  May 11, 2005, Miina Siekkinen, working with Paul Merritt, announced a realignment of account executives to sales engineers (including Nunnally), some assignments of which were likely and intended to interfere with the performance by Nunnally of her job duties.

> d.  On July 22, 2005, Miina Siekkinen issued a disciplinary Verbal Warning to Nunnally based upon new, changed standards of performance never previously announced or enforced against Nunnally, applied unequally to Nunnally and not to comparator employees who engaged in the same or similar conduct.

> e.  On July 25, 2005, Eesa Thompson and Miina Siekkinen changed the procedure applicable to scheduling appointments with Nunnally so as to require Siekkinen's personal involvement in any appointment request involving Nunnally.  The change applied only to Nunnally and not her counterpart.

> f.  On July 25, 2005, Miina Siekkinen announced that Nunnally's office was being moved to a cubicle located as close as possible to Siekkinen's office, apparently for purposes of permitting Siekkinen's closer scrutiny of Nunnally's job performance.

> g.  On August 3, 2005, despite a purported hiring freeze, Siekkinen announced the hiring of an additional sales engineer (in the same position as Nunnally) who had previously worked for XO Communications and

had quit without notice . . . This hire gave Nunnally additional reason to believe her own employment was at risk.

h.  During the week of August 8, 2005, Siekkinen was seen more than once rifling the top and the contents of Nunnally's desk, behavior which was commented upon by Nunnally's co-workers because such conduct was unusual.

(Nunnally Decl., Ex. 2.)  An investigation was conducted by OSHA which determined that "no protected activity on the part of the complainant contributed to any of the adverse actions she alleges."  (Benton Decl., Ex. 7.)  Ms. Nunnally did not appeal this determination.

Ms. Nunnally identifies the public policy at issue here as "supporting employee whistle-blowing activities, particularly as [they] relate to the subject of financial improprieties or dishonesty by publicly traded corporations."  (Resp. at 13.)  The provisions of 18 U.S.C. § 1514A provide protection for "whistle-blowers" like Ms. Nunnally who report what they believe to be financial improprieties and remedies if they face retaliation.  Here, Ms. Nunnally started to take advantage of this process by filing an administrative complaint but failed to file an appeal when she received an adverse decision.

Ms. Nunnally argues that she retained her right to file this lawsuit, citing 18 U.S.C. § 1514A(d), which provides:  "Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any Federal or State law, or under any collective bargaining agreement."  Ms. Nunnally's public policy argument is premised solely on federal law, Sarbanes-Oxley's protection for whistleblowers, and therefore the act does not take away a state cause of action but rather potentially gives Ms. Nunnally a state cause of action.  Ms. Nunnally failed to take full advantage of the protections to which she was entitled under Sarbanes-Oxley.  She is not now entitled to a second bite at the apple.

ORDER – 20

Ms. Nunnally also argues that her state law claims seek damages that are not available under Sarbanes-Oxley. Ms. Nunnally does not explain how this renders inadequate the available administrative procedure for promoting the policy. This argument is also unpersuasive given Sarbanes Oxley's pronouncement that an employee "shall be entitled to all relief necessary to make the employee whole." 18 U.S.C. § 1514A(c)(1).

At oral argument, counsel for Ms. Nunnally further argued that the other means for promoting the public policy were inadequate and distinguishable from the situation presented in *Korslund II*[4] because there is no public posting requirement in Sarbanes-Oxley; Sarbanes-Oxley does not have a public hearing requirement; there was a 180-day statute of limitations at issue in *Korslund II* whereas under Sarbanes-Oxley the statute of limitations is 90 days; and the time given to the agency to make a determination was longer here than in *Korslund II*. The court is not persuaded that the differences between the statute at issue in *Korslund II* and Sarbanes-Oxley make the other means for promoting the public policy inadequate. Ms. Nunnally's primary concern seems to turn on the alleged "secrecy" of the proceedings initiated pursuant to Sarbanes-Oxley. Proceedings initiated pursuant to the whistle-blower provisions of Sarbanes-Oxley are not secret. If Ms. Nunnally was dissatisfied with the decision she received from the agency she had the opportunity to appeal to an administrative law judge and eventually to the United States Court of Appeals for the Ninth Circuit. *See* 29 C.F.R. § 1980.112. Ms. Nunnally has not cited to any statute or regulation that indicates that proceedings before the administrative law judge or the Ninth Circuit would be kept secret. The court is also

---

[4]The *Korslund II* court held that the jeopardy element was not satisfied in that case because the Energy Reorganization Act contained remedies that were adequate to protect the public policy at issue. 125 P.3d at 127.

ORDER – 21

not persuaded that the 90-day statute of limitations and the 180-day decision period make this alternate means for promoting the public policy inadequate.

Having considered and rejected Ms. Nunnally's arguments, the court determines, as a matter of law, that the jeopardy element of Ms. Nunnally's public policy claim cannot be established because the other means for promoting the public policy in Sarbanes-Oxley are adequate.[5]

## C. Timely Appeal of OSHA Retaliation Claim

XO argues that Ms. Nunnally's wrongful discharge claim should be dismissed because her state law claim constitutes an untimely appeal of the 2006 dismissal of her OSHA claims. Because the court grants the motion with respect to the jeopardy element of the public policy claim, there is no need for the court to reach this issue.

## D. Motion for Sanctions

XO has filed a motion for sanctions (Dkt. # 35) based on Ms. Nunnally's failure to timely file a pretrial statement. The court declines to impose sanctions.

## III. CONCLUSION

For the foregoing reasons, the court GRANTS the motion for summary judgment and DENIES the motion for sanctions.

DATED this 15th day of January, 2009.

_____
JAMES L. ROBART
United States District Judge

---

[5]A recent Wisconsin Court of Appeals decision reaches a similar result. *See Repetti v. Sysco Corp.*, 730 N.W.2d 189 (Wis. Ct. App. 2007).

ORDER – 22